The last matter on our calendar is Professional Orthopaedic Associates vs. 1199 Benefit Fund. I'd like to reduce my rebuttal to two minutes from three minutes, if that could be accommodated. I represent the appellants in this matter. It's an orthopaedic surgeon and his practice. The reason I'm here is that under the tenets of the ERISA, the patients and the professionals that rendered medical services are entitled to proceed with civil action by a participant or a beneficiary. And that review includes... Your client is... the orthopaedic practice is not a participant or a beneficiary, is it? So, Your Honor, and I should clarify that at the outset, the plaintiffs in this case are Professional Orthopaedic Associates, Jason Cohen, MD, both on behalf of Patient AM and Patient AM is also named as a plaintiff and has been since the outset. So she's the plaintiff and she's your client? They are all our clients. They are all the plaintiffs. Well, so which one of them is a participant or beneficiary? Only the patient, right? So only the participant, the only participant in the strict construction of beneficiary is the plaintiff. However, under ERISA, you may assign your rights to proceed. But she did. She assigned her right to sue? She assigned her rights to claims and to receive medical information from the file. Are you saying the DAR is an assignment? I am saying the DAR is an assignment. You are? That's your position? That is the position, yes. It's a designated authorized representative form, which clearly gives the Professional Orthopaedic Associates the right to appeal to the insurance company any determination and also to disclose, disclosure in full, furnish medical and financial information from the file. My point is, you're talking yourself into a more difficult position than you need to be in. To take an assignment, it's got to be an assignment, a yielding of all right title and interest in a recovery, and the document, the DAR, doesn't say anything like that. On the other hand, if your client is merely a representative, then it could be like an attorney appearing for your client or someone who holds a power of attorney appearing for your client. It would be a much heavier lift to say that the doctor and his practice are representatives than they are assignees. Of course, if they're only representatives, then any recovery presumably goes to the patient, and I take it you're trying to establish that a recovery should go to the doctors. Your Honor, based on the way that the DAR form is written, any recovery to the patient would inherently go to the doctors. There is an assignment of that, I believe, on the second page of the DAR, which is attached to my appendix as 25 through 27. Then if that's true, how is the patient a party anymore? If the party has assigned everything to the doctors, why is she here? Because the premise here today is that by virtue of the fact that the practice filed the appeals and by the fact that they pursued the appeals on behalf of the patient, then the patient no longer has a viable claim, and that is what . . . She's a plaintiff. I'm not taking that position. That's the position that was rendered by the district court. We put her in the caption. We did put her in the caption. Why is she in the caption? She's in the caption because under either theory, our clients, the plaintiffs, are entitled to recovery. So if you don't have the patient, you have the practice. If you don't have the practice, you have the patient. What the mechanism that's being used to deny her recovery is to say because those appeals were taken by the practice, that she no longer has a cause of action, and that because those form and weren't done on a timely basis and, I'm sorry, weren't sent to a particular location and address, that they're not valid appeals. You're really not answering my question. I know you're trying. I apologize. But the question is, if an assignment has been made, then the patient has no longer any right, title, or interest and doesn't belong in this case. I would say if it is determined that an assignment has been made, that the plaintiff doesn't need to be any longer in this, I'm sorry, the patient doesn't need to be in this case. Do you agree that the assignment was not complete? I don't. I don't agree that the assignment was not complete, Your Honor. I'm very, for purpose, Maybe we'll consider it a pleading in the alternative. She's there in case the assignment wasn't valid. That is correct. That is correct. She is there in case the assignment is not valid. I do not take the position that the assignment was not valid, but, Did she in fact assign the right to sue on her behalf? The words to sue or anything similar to that, I agree, are not contained in the DAR form. However, a case, Let me ask you this question. When the practice, the doctor, sent in the letters, did they include a copy of the DAR? Is that in the record anywhere? If you don't mind, I believe it was. Excuse me. Sorry for taking that. One time, both times, or not at all? I would have to take a look at the record, Your Honor. I believe at least one time, if not both times. Could we get to the actual merits here? What is the basis for the claim that the, the factual basis for the claim that the plan provides payment for the ordinary and customary charges for this service in the community? Well, ordinary and customary kind of has a euphemistic value. What, what, ordinary and customary is what the plan provides. And we don't know what the plan provides, because there has been no determination. There's been no discovery. Only a part of the plan was put forward to the district court, despite the explicit request for any financial and other information. What the doctors requested was not what ordinarily a participant is authorized to request from an ERISA plan. The participant is entitled to say, please send me a copy of the plan. What the doctors asked for was, please justify your charges, which is a completely different thing. They didn't, there's not a request on behalf of the patient for a particular document. There is a kind of justify your decision demand. Is that the same thing as the stat, what the statute permits or requires the, the plan to respond to from a participant? So I understand your question. And what, when a provider, a medical provider is asking for justification of how a particular benefits were calculated and determined, inherently one must provide the summary plan description and the schedules there too, to. What gives the provider a right to any of that, or for that matter, what even gives the participant a right to a kind of account of how something was arrived at, as opposed to a very, the statute is very specific that the participant has a right to demand certain documents. And what I'm saying is I, I agree that it says that there, and they are entitled to request documents. And what I'm saying to you is by virtue of the fact that the appeals were filed and documentation was asked for, that inherently that the documentation that was asked for would include a copy of the plan and the schedules. I thought what the complaint talked about and what the demands talked about was tell us how you arrived at the idea that this is the ordinary and customary amount. Well, I don't know that we even reach that at this stage, Your Honor, because... No, I'm talking about things that have been reached at this stage, and I'm asking whether I'm correct, that that is what was asked for in the appeals letters and in the complaint, what was said to be missing, or am I mistaken about that? The appeals letters asked for, how did you determine your calculation of benefits? How did you get to that? There were two appeals letters, and they asked... They were sent to the wrong address. They were, Your Honor. They were. But there is case law that says that claims procedures cannot be established that prevent a participant, and in this case, also their assignees from pursuing a claim. So it's a technical failure. You also said that the address wasn't given in the explanation of benefits, and the very pages you cite to show that the address is there. And you know what, Your Honor? I do realize that now, having reread the very, very fine print on the bottom of the explanation of benefits. However, they did substantively comply, and no one can deny, and no one has denied those appeal letters were received. I'm seeing the whole problem here, that your clients are used to dealing, your professional clients, are used to dealing with insurance companies where there's a lot of back and forth and discussion and justification, and maybe not so much an ERISA plan where you have very specific requirements that you have to meet. Well, first of all, I don't know what you mean by a lot of back and forth. The clients are out-of-network providers, so they are in the realm of ERISA and ERISA litigation. They are familiar with it. There was no back or forth. There were just payments, which is an acknowledgment that they received the appeals. Doesn't the SPD make clear that there is a schedule, first of all? There's no such thing as we figure out the ordinary and customary payments, and there's no such thing as you get what the doctor charges. It's clear that there is a schedule, and whatever it is, I mean, it doesn't say what the schedule is for this particular procedure, that there is such a schedule, and if you are going to an out-of-network provider, you or the provider should call in advance and find out what we're going to pay. And if you don't do that, you're at risk that you're going to have to pay a lot of money to the provider. Isn't that not absolutely clear from the SPD excerpts that are in the record? Certainly the SPD provides that there is a schedule. We don't know what that schedule says. It hasn't been provided. It's customary to get that as part of the administrative record. Wasn't the patient required to call the insurance company, which is the benefit fund, and find out what the schedule was before she incurred these expenses? I'm not sure that she was, Your Honor. You know, if someone can show me where that is in the record, but I'm not sure that she was. He just read it to you. He just read it to you. Before you look at page A80, if you use a non-participating provider, you could face high out-of-pocket costs before you receive services from a non-participating provider. You should ask the provider to find out the total benefit fund allowance for the planned service by calling, there's a specific number, I won't put it on the record, and to notify you of what your out-of-pocket expenses will be. Could you just repeat what, that's A? A80. A80. A80. A80. A80. That's section 2F, surgery and anesthesia of the SPD. It's written as should, Your Honor, not that it was mandatory, and I would argue that there's If you don't do it, then you don't get all your money. Oh, no, I don't think that's a proper reading with all due respect, Your Honor. I don't think it says that. It says you're at risk. It says this is what's going to happen. And if you use a non-participating provider, you could face high out-of-pocket costs. Everybody who has insurance knows that if there is a network and you go out of network, you better be careful because you might wind up with a big bill from the provider who isn't going to accept whatever amount, paltry amount, perhaps the insurance company is going to provide. But does that necessarily mean that just because one might expect it, that one, a provider or a patient needs to accept that and is not entitled to a clear delineation of how that determination would meet? That would mean you would give carte blanche to an insurer. The time to get this information is before the patient sees the doctor and agrees to the surgery. Isn't that what it says? The plan makes that recommendation, Your Honor. It does not say that you will be stuck with the out-of-pocket without . . . It does say if you don't do this, you run a risk of high out-of-pocket costs. Your Honor, there's plenty of case law in this circuit and other circuits where the provider, in this case 1199, is evaluated on an arbitrary and capricious basis. So we have to give credence to that, to the fact that this is something that is routinely evaluated in the courts and there is an administrative record made and a determination is made as to whether the plan paid in accordance with the benefit schedule. Because there is a recommendation . . . That's not what your complaint says. Your complaint doesn't say the plan did not pay in accordance with the schedule. The complaint seems to me to be saying that as a substantive matter, the doctors are entitled to whatever is ordinary and customary in the community. That may or may not be half a million dollars for a procedure that I'm not sure the record even tells us what it was. But that seemed to be . . . I thought that's what the complaint was about. The complaint . . . You're saying the complaint was drafted . . . It means by ordinary and customary in the community, it means tell us what your schedule is. It can mean that. Yes, Your Honor. And what you're saying is that the schedule that most ERISA plans would use is set based upon ordinary and local rates. That's right. That's right. But it's really . . . it was not well drafted, that complaint. Saying that would have been different. Well . . . All you get is the schedule, however it was arrived at. You can't dispute the schedule. But we don't have the schedule. And I would agree with you. In this case, we get the schedule and we evaluate it and we weren't provided the schedule, even though the appeal letters ask for, give us . . . What basis is there for any belief that what you got was not what's in the schedule? What makes that plausible? We didn't get a schedule. So what? What makes you believe that the amount provided was not the scheduled amount? Well, first of all, two parts. Number one, we're entitled to ask for it, pursuant to the statute. We're entitled to ask for that information. And that would undermine the statute. The statute was drafted so that providers and patients could know how these calculations were done. And that's the basis for bringing a lawsuit, a claim, under ERISA, is that you can evaluate. That's part of Title 29, says that you can seek evaluation of the provision and the calculation. So how does one give effect to ERISA without being able to receive the information, evaluate the . . . and the court to evaluate how the calculation was made? Does that answer your question? We've gone way over time, but you have reserved two minutes for rebuttal. We'll hear from 1199. Thank you. Good afternoon. May it please the Court, I'm Suzanne Metzger. I'm Assistant General Counsel for the 1199 National Benefit Fund, and I represent the appellee. Why don't you give her the schedule? We did, actually. So if you look at . . . if you don't call ahead and you go ahead and get the procedure, you get the explanation of benefits, the patient does, and the doctors get the explanation of payments. On that, there's a column for every CPT code, the current procedural technology code. Every service has a code. They build over a dozen . . . like, every possible code. We paid, by the way, every code they build. We have a column that says allowed amount. That's the fee schedule for the particular . . . for the CPT codes that they're building. It's a well-known EOB, right? Right. The EOB. So their allegation has to be that there is some schedule somewhere that your folks looked at to decide what to put down as the amount that would be paid, and that there is a discrepancy somehow between what you listed in the explanation of benefits and what is in the secret schedule that you maintain somewhere in your office. Is that the way you understand this complaint? I mean, that's what I'm assuming. I mean, so . . . And the question would be . . . so the question is, is there any plausible evidence or anything that would suggest that that is factually the case, that the amount that is listed on somehow not in fact what the plan has promised to pay for that particular procedure? I don't think there's any basis to think that. Like I said, the EOB has both the schedule fee and the amount we paid, so you can compare what you have. I think they are arguing and continue to argue that we need to provide the data or the justification for coming up with that schedule in the first place. But the data doesn't matter because the plan pays what it pays. If you looked at what was payable in the community and decided, whoa, this is a very expensive community, we're just not going to pay that, is there anything in the statute that says you have to pay more than what the plan says it will pay? There's nothing in the statute. There's nothing in the law that says that we have to use any particular data or rationale to come up with our schedule. There's nothing in the law that says whether we do or not, we need to provide that information. Did I hear you say that you paid every code that the doctor listed? We paid every code, yes. So when we paid additional payments, just what was happening there was . . . And this happens all the time with insurance. The doctor says it's this, and you say, oh, well, if it's that, you get this much money. And then there's some negotiation where the doctor says, actually, I should have called it something else and puts a different code down. That's correct. And that's what happened here. The back and forth was between our vendor that reviews for medical necessity. You know, you go to get a surgery, you need to get a prior authorization for that. You obviously must believe it's a medical necessity because you paid a certain amount of money, although not what the doctor billed. So what happened to the money that he billed, I assume, and you say you paid all the codes that he billed? What about the money that he didn't get? So I think there was a back and forth, like I said, with our vendor about which codes were payable. But you didn't pay every code. We did pay every code. So when you see that we paid additional sums, you know, I think I have the 2012, 2014, right? So upon review, our vendor said, OK, these codes, they didn't appear to be in the original prior authorization. We see them now. They're appropriate. We'll pay them all. And so our last payment in September 2014, that was the last of the codes. We paid all the codes. Let me just say this. What went wrong here? The doctor had $600,000 worth of services and got $15,000. Just going outside the record, who messed up? What happened here? I mean, there was no mess up. So they're saying, bear in mind that that half a million dollars for half a day's work, it's a common back surgery. And I can say this because it's in the EOBs in the record. It's a spinal fusion of a lumbar and a spinal disc. We have plenty of participating. If I go to Professor... You're not paying for the half day. You're paying for the 20 years the doctor studied to know how to do it in half a day. Oh, yeah. I mean, there's the expertise, for sure. But we have, like, we have a, we had, I think we looked, I had 26 participating orthopedic surgeons that would have performed the same thing for what we pay, and the patient wouldn't have had one nickel of out-of-pocket. If I decide that I'm going to go to Professor Genius, who invented this surgery and is the greatest person in the world to perform this surgery, he or she may charge a real lot of money for it because of their skills, but that's not what you have agreed to provide. You've agreed to provide a certain amount, which has been accepted by the in-network people, and you advise the participant that if you choose to go to Professor Dr. Genius, you are at risk that that doctor will charge a lot more than we provide. There's no screw-up by anybody. It's just that the doctor happens to be the Derek Jeter of doctors and thinks that she's entitled to a zillion dollars. Right. And that's true. And maybe, because, you know, when the Sheik of, yeah, when the Amir of wherever comes to get the surgery, they'll pay that. That's correct. And for whatever it's worth, there was no argument here that they provided a specialized service above and beyond anything in our network. You know, the patient didn't say, oh, we couldn't use anyone in your network. I had to go here. And it's important. The whole plan is designed to encourage our participants to stay in our network because we have, I mean, we have a lot of leverage and density. We're a plan, a trust fund for union, low-wage workers, and, you know, we have, there's no reason to go outside the network. So we encourage people to use our plan. Well, I don't know why this patient went outside the network, but you must admit that she had a perfect right to do so. She had every right to do so. So we do provide, unlike an HMO, if you, if any patient goes out of the network, we provide a reimbursement rate. And it's in accordance with our, with our schedule of fees. And like I said, we paid everything that they billed, but then they're turning now to our, our rate. And they're saying our rate for every code is not reasonable, but what they charged is not tied to any basis, you know, any. $165,000 that the doctor billed and didn't receive. Was that a code issue or? No. Every pay, every code was paid, but they are saying the rate that we paid for every code is too low, according to, lower than what he charges, lower than what he charges, lower than some percentage in their view. Yeah. Okay. I guess what's still surprising me is I understand you can get really sacked when you go out of network and that, that's fine, but I didn't know you could get really sacked this badly 15,000 as compared to 565,000. Is the discrepancy between network and out of network really that extreme? No, actually our in network rates are not much more than we paid. We paid the doctor about 14,000 for the surgery. We paid the hospital about almost 70,000 for the hospital stay. And then we had another 5,000 for other people that worked. And so, and the thing is, is the plan design makes sense for us because like I said, our participants pay nothing. They can go anywhere and they could have gotten this surgery at any of the teaching hospitals in Manhattan and not paid anything. And if we had a plan design where we pay exorbitant fees for out of network providers, even though they could, you know, our participants could go somewhere else, we'd, then we wouldn't be able to provide the comprehensive plan that we do for the low wage workers that, you know, and, and we'd have a much, a much worse benefit. It just doesn't make sense to, to design the plan any other way. Thank you. Thank you very much. Um, uh, Ms. Woxie, you're reserved two minutes for rebuttal. Thank you, your honors. And I want to address, um, what was just discussed by, um, the police, um, concerning the codes. I just become educated more than anything that's been, um, that is provided in the record about how these determinations were supposedly made. Um, I challenge you to find all this evaluation in the record. No, no, no. I challenge you. In the record. I, I agree with you. There's an explanation of benefits that says this is the scheduled amount. And what I'm asking you is what actually is your complaint? Is your complaint that you believe that that's not the true amount payable for that code, number one? Or is it your belief that there is some obligation on the part of the plan to pay more than the What I'm saying is that I believe they are required to pay the schedule amount. I'm also saying that that doesn't appear on the explanation of benefits. Explanation of benefits form says here's how much we pay for this code, but everything else is excess. And it doesn't say how that's determined. Well, why, why would, why would they have to say how it's determined? They made it up. They decided that they're only for a back surgery. They're going to pay X thousand dollars. What in the plan or what anywhere gives you a reason to believe that there is some entitlement to that calculation being reasonable in some way? I'm not saying, I don't, I'm not using the word reasonable. Saying reasonable customary is the word you used in your complaint. But you're now saying that's not really what you meant. You really meant that they have a secret schedule that they have not shared with you and that the amount on the explanation of benefits is incongruent with the actual schedule. Is that what you're saying? What I'm saying is the calculation and the payments need to be accurate. And without seeing the schedule and how the schedule and how the calculations are done, it is impossible to know whether that payment was accurate or not. What basis could a, what factual basis would someone have a reasonable belief or would it be plausible that when you submit a claim to an insurer and the insurer says in the explanation of benefits, sorry for a tooth extraction or a life-saving cancer surgery or whatever it is, here's how much we pay to out-of-network people. That somehow that is a falsehood. That's a rather striking allegation to make. And I don't see anything suggesting that there's any plausibility to that. Then how does one give meaning to the terminology in ERISA that says you're entitled to understand and get the information result, excuse me, concerning how the calculation was done. But they told you it was done by these codes and each code has a fee with it. That's what they give. If your client had called before undergoing this surgery, she would have been told what the reimbursement is. There's a difference between what the reimbursement is and how it was calculated. So I don't understand what you mean by how it was calculated. There's a code and there's an amount and they say that amount is what we pay for that code. So what is the calculation that you're asking about? The calculation that I'm talking about is there is financial data that was given in the reply brief talking about, and let me just find it if I could, there was an actual information given about how the codes and how the, what the schedule allowances were. What are the codes that your doctor submitted codes and the plan paid the codes according to the schedule? What's the problem? Because there are certain criteria that go into determining how the codes are paid. Sometimes it's based on Medicare or a percentage of Medicare. The same code can yield a different payment? Depending on how the plan is written and then how the schedule is written. Yes, I am saying that. So you're saying that the plan may provide, not the SPD, but the actual text of the plan, not that we pay according to a schedule that we determine in proprietary ways that we don't share with you, but rather that the plan might say we pay 20% or 80% or 93.6% of what Medicare pays. Or more. Maybe over 100%. We pay 120% of what Medicare. And what basis do you have for thinking that that is true in this case? Because in the reply brief on, I believe it was page three of the reply brief, it says that the fee schedule is based on Manhattan Medicare fee schedules. Wait, this is your reply brief? No, it's, I believe, my brief says. You mean the opposition, their brief, the red brief? Their brief says that it was based on, the fee schedule was based on Manhattan Medicare fee schedules, which we have not been provided and have not been able to validate. Let me clear up one thing. You're not suggesting that a different beneficiary of this plan who went and got the same surgery would get a different amount of money. I am not saying that. I'm saying that we need to test whether or not the fees, the schedule of allowances and the fee schedule was based on the Manhattan. All they're saying is as it happens, the trustees have historically based these fee schedules on Manhattan Medicare fee schedules. So what? They're not obligated to do that. But we, they're not obligated to do it, but once they, they say they've done it. No, they say they historically did it. That doesn't even say they do it now. So, but we're entitled to see what it was based off of and whether that formula was a calculation of benefits. What, but if they're not obliged to use that formula, why are you entitled to see that formula? What difference does it make? Because that, that is part of, that's part of the administrative record that my clients are entitled to. They're entitled to see not only what it was based on, but how it was calculated. And one can only necessarily review that if one has the CPT codes and the fee schedule and what it was based on and test, and test those numbers. And we'd like the opportunity to be able to do that. And that this has not come up until the reply brief. Okay. I think this is where we'll end this discussion. Thank you very much. Thank you both very much for a very lively argument. This is the last case on our argument calendar. So I will ask the clerk to adjourn court. Court is adjourned.